**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------x
BROOKLINE LLC d/b/a Lilogy,                  :
                                             :        Case No.:
        Plaintiff,                           :
                                             :        COMPLAINT
        v.                                   :        JURY TRIAL DEMANDED
                                             :
BARUPON LLC,                                 :
QYK BRANDS LLC,                              :
BALAJI TAMMABATTULA,                         :
RUPA TAMMABATTULA,                           :
                                             :
        Defendants.                          :
                                             :
------------------------------------------------------x
```

Plaintiff, Brookline LLC d/b/a Lilogy ("Lilogy"), by and through undersigned counsel, as and for its Complaint against Defendants Barupon LLC, QYK Brands LLC, Balaji Tammabattula, and Rupa Tammabattula, hereby alleges as follows:

## STATEMENT OF THE CASE

1.      This lawsuit arises out of the breach of a contract for the sale of 27,725,000 Covid-19 test kits to the New York City Health and Hospitals Corporation ("NYC H+H") which were worth in excess of $40 million. Defendant Balaji Tammabattula fraudulently induced Lilogy to identify and source all of the test kits through one specific manufacturer and create a logistics plan to ensure the tests could be delivered on a timely basis on behalf of his company QYK Brands LLC. However, once Lilogy performed, Balaji Tammabattula and his wife Rupa Tammabattula, circumvented Lilogy and purchased the test kits directly from Lilogy's manufacturer through their company Barupon LLC.

## PARTIES AND JURISDICTION

2.      Plaintiff Brookline LLC d/b/a Lilogy is a Connecticut limited liability company with a principal place of business in New York County.

3.      Defendant, Barupon LLC ("Barupon"), is a California limited liability company doing business in New York State.

4.      Defendant, QYK Brands LLC ("QYK"), is a California limited liability company doing business in New York State.

5.      Defendant, Balaji Tammabattula, ("Tammabattula") is a resident of California and over the age of 18. Tammabattula is the husband of Defendant Rupa Tammabattula.

6.      Defendant, Rupa Tammabattula, is a resident of California and over the age of 18. Rupa Tammabattula is the wife of Defendant Balaji Tammabattula.

7.      Venue is proper in this District because the causes of action asserted herein accrued in New York and Barupon and QYK each executed an Exclusivity Agreement with Lilogy that contains a forum selection clause requiring any action to be filed in this District.

8.      This Court has original jurisdiction over this matter in accordance with 28 U.S.C. § 1332 as there is complete diversity of citizenship and the damages sought are in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees.

## GENERAL ALLEGATIONS

### A. The Parties Lay the Groundwork to Supply Nearly 28 Million Covid Tests to NYC Health + Hospitals.

9.      Lilogy's business lines include sourcing and supplying personal protective equipment ("PPE") and testing kits for Covid-19.

10.     Lilogy was first introduced to Balaji Tammabattula in February 2022. Lilogy's first interaction with Tammabattula was related to a Covid-19 test kit contract with San Diego Unified School District.

11.     Tammabattula held himself as an owner and COO of QYK.

12.     The parties then engaged in discussions regarding the potential collaboration on current and future Covid-19 testing product supply arrangements. To further those discussions, on March 16, 2022, Lilogy and QYK entered into the Exclusivity Agreement attached as **Exhibit A**.

13.     The exclusivity provision provides, in full:

1. Exclusivity. Except as otherwise provided herein, **Grantor[1] shall not, and shall cause each of its Representatives** (as defined below) **and Affiliates** (as defined below) **not to, enter into any agreement, contract, understanding, letter of intent, memorandum of understanding, or other arrangement, with any third party for the manufacture and supply of any COVID-19 testing products other than with and through Grantee in accordance with the terms and conditions set forth herein** (a "**Proposed Transaction**"); *provided, however*, that any COVID-19 testing products or SKUs set forth on **Exhibit A** shall be exempt from this Agreement. The Parties may agree to update and supplement Exhibit A from time to time after the date hereof pursuant to a writing signed by the Parties.

Ex. A at ¶ 1 (initial emphasis supplied).

14.     The Exclusivity Agreement also provided Lilogy with a right of first refusal on any "Proposed Transactions" for PPE products on the terms set forth below:

2. Right of First Refusal. **In the event that Grantor proposes to engage in any Proposed Transaction, Grantor grants to Grantee a first right of refusal to provide to Grantor any and all COVID-19 testing products, supplies, and services**. If Grantee shall quote pricing for any such products, supplies, or services above the then-current pricing being paid Grantor, Grantor will provide a pricing list and afford Grantee an opportunity to match or beat the last known paid price for such test or supplies by Grantor. **In the event that Grantee is unable to match or beat the last known paid price for such test or supplies by Grantor or is unable to supply in the required time period, Grantee may source such test, supplies, or services from such other supplier so long as the price actually paid matches the last known paid price quoted to Grantee, in which case Grantor**

---

[1] QYK was defined as the Grantor and Lilogy as the Grantee.

> **shall also pay to Grantee a "lost profits" fee equal to 15% of the price paid for such test, supplies, or services.**

*Id.* at ¶ 2 (emphasis supplied).

15.     The Exclusivity Agreement prescribes an initial term of twenty-four months with automatic one-year renewals and may be terminated with written notice not less than 60 days prior to the expiration of the term.  By its own terms, the provisions of the Exclusivity Agreement apply until March 16, 2024 at a minimum.

16.     The Exclusivity Agreement requires the application of New York law.

17.     On May 11, 2022, Lilogy and QYK entered into a Mutual Non-Disclosure and Non-Circumvent Agreement ("MNDA") attached as **Exhibit B**. The MNDA required the parties to keep information confidential and prohibited the parties from circumventing each other.

18.     Specifically, the MNDA provided, in relevant part:

**2. NON-DISCLOSURE AND LIMITED USE.**

a. **Recipient shall hold all Confidential and Proprietary Information in strict confidence and shall not disclose any Confidential and Proprietary Information to any third party**, other than to its employees, agents, lenders, and consultants (including without limitation attorneys, accountants, and rating agencies) who need to know such information and who have agreed to maintain the confidentiality of the Proprietary Information **and not use any Proprietary Information for the benefit of itself or any third party or for any purpose other than the Purpose.[2] Recipient shall not use any Confidential and Proprietary Information for the benefit of itself or any third party or for any purpose other**

---

[2] The "Purpose" was defined as follows:

The Parties wish to protect and preserve the confidential and/or proprietary nature of information and materials that may be disclosed or made available to each other in connection with certain discussions, negotiations or dealings between the Parties relating to the business relationship between the Parties related to the supply of hand sanitizer, protective gloves, face masks, isolation gowns, and other janitorial, medical, and personal protection equipment products, and other products to third party clients and customers (the "Purpose").

*Id.* at p. 1.

**than the Purpose.** Recipient shall take the same degree of care that it uses to protect its own Confidential and Proprietary Information and materials of similar nature and importance (but in no event less than reasonable care) to protect the confidentiality and avoid the unauthorized use, disclosure, publication or dissemination of the Confidential and Proprietary Information. **Recipient will not, and will direct its Representatives not to, disclose to any person (other than its Representatives):**

> i. **The existence of** this Agreement or **any purchase orders or other agreements with any clients or customers of the Disclosing Party**, and/or;

> ii. That the Confidential and Proprietary Information has been made available to Recipient or its Representatives.

*Id*. at ¶ 2 (emphasis supplied).

19.    The non-circumvention provision of the MNDA stated, in full:

**9. NON-CIRCUMVENTION**

a. **During the Term of this Agreement** as set forth in Section 6, above, **the Parties hereby acknowledge that information furnished by either of the Parties to the other Party concerning any prospective transaction** for the manufacture, procurement, sourcing, supply and distribution of hand sanitizer, protective gloves, face masks, isolation gowns, and other janitorial, medical, and personal protection equipment products, and other products **and including leads, opportunities, situations, corporations, partnerships, and/or persons conducive to any prospective buyer, seller, manufacturer, supplier, distributor, vendor, partner, investor or borrower, are the personal property of the introducing Party, and therefore, hereby irrevocably agree not to, and to cause each of their members, shareholders, officers, directors, employees, consultants, contractors, agents, representatives, affiliates, or not to, circumvent, avoid, bypass, or obviate (collectively "Circumvent") the introducing Party, directly or indirectly**. For the avoidance of doubt, any breach of this Section 9, or breach of a Recipient's obligation to maintain the confidentiality of a Disclosing Party's Confidential and Proprietary Information that results in any third party engaging in a transaction that would otherwise be prohibited by the first party of this Section 9(a) if engaged in by Recipient shall be deemed to be a breach of Recipients obligation not to Circumvent pursuant to this Section 9(a). Either Party will immediately inform the other Party regarding any agreement, arrangement, meeting, contact, undertaking, act or intent, including transactions and situations involving investors and/or prospective clients, customers, re-sellers, manufacturers, or distributors of hand sanitizer, protective gloves, face masks, isolation gowns, and other janitorial, medical, and personal protection equipment products, other personal protection equipment products, or other products in subsequent transactions, or occurring after the termination of this agreement, by which a

commission, fee, profit, income, royalty, back-in, reversionary interest, or other benefit could result or accrue to the introducing party concerning such prospective clients, customers, re-sellers, manufacturers, or distributors, including leads, opportunities, situations, corporations, partnerships, and/or persons. **In the event of circumvention, either directly or indirectly, the introducing Party shall be entitled to all sums, fees, or other value it would have realized if not for the circumvention, as well as any other remedies available to such introducing Party at law or equity. In connection with any action by either Party to enforce it rights under this agreement,** or in collection actions arising therefrom, **then either Party shall be entitled to recover its reasonable outside attorneys' fees and costs from the breaching Party, including fees and costs incurred for mediation, arbitration and/or all judicial actions and appeals**

Ex. B at ¶ 9 (emphasis supplied).

20.     The MNDA requires the application of New York law.

21.     On August 11, 2022, NYC H+H published a Request for Bids seeking a bulk order of 27,725,000 FDA-approved over-the-counter Covid-19 nasal swab tests for individual use that were either individually packaged or packaged as two tests per box (the "Kits"). *See* Request for Bids attached as **Exhibit C** at p. 6.

22.     According to the Request for Bids, 20 million total tests were to be delivered by September 10, 2022, with the remaining 7,725,000 tests to be delivered by October 1, 2022. *Id.* All of the Kits were to be delivered to a warehouse in Pennsylvania. *Id.*

23.     Bidders were competing on the price per test and the award would generally be made to the single lowest responsive bidder. *Id.* at p. 6, 8. Bids were due by 5:00pm on August 17, 2022. *Id.* at p. 3.

24.     The Request for Bids also specified the minimum criteria for bidders, which included, in relevant part, that the corporate bidder must have 2 years of experience providing multiple shipments of 5 million Covid tests for a hospital or hospital system and an annual corporate revenue of $10 million for the past 3 fiscal years. *Id.* at p. 7.

25.     Per the Exclusivity Agreement, Lilogy was QYK's exclusive supplier of Covid-19 testing products and the parties had successfully completed multiple transactions leading up to the Request for Bids. On August 15, 2022 Tammabattula reached out to Lilogy to enlist its help in winning the bid, leveraging Lilogy's prowess as a supplier for the Kits. Because Lilogy had been active in sourcing and supplying PPE and Covid-19 test kits to customers around the country on a large scale, and had built relationships with a variety of manufacturers, it was able to tap its resources and identify a two manufacturers that were collectively able to meet NYC H+H's enormous demand within the required time frame at an acceptable price: Genabio Diagnostics, Inc. ("Genabio") and Celltrion USA Inc ("Celltrion").

26.     Also on August 15th, 2022, reaffirming the Exclusivity Agreement, Lilogy, QYK, and Tammabattula verbally agreed over the telephone that if QYK won the bid, it would rely upon Lilogy to supply the Kits through Lilogy's manufacturers, Genabio and Celltrion.

27.     Lilogy, QYK, and Tammabattula further agreed on that date that Lilogy would secure the production, organize the shipping, and build out all the other components of an international supply chain necessary to supply the test Kits and for such efforts receive its portion of the profits from QYK and Tammabattula.

28.     An entity seeking to supply nearly 28 million Covid test kits needs access to a substantial amount of capital. The supplier needs to pay the manufacturer tens of millions of dollars for the test kits and needs millions of dollars to cover shipping and insurance costs. The manufacturer typically requires a substantial deposit up front. However, the supplier will not recoup any of these funds until the test kits are manufactured, shipped, accepted by the buyer, and the invoices are paid by the buyer after net payment terms. Because this process can take months, the supplier must be able to float tens of millions of dollars for a period of approximately one to

four months. It is not uncommon for a supplier of QYK's size to obtain financing for a portion of the deposit, inspections, freight, insurance, finished goods and also rely upon invoice factoring in order to generate enough cash flow to fulfill the entire contract.

29.     The transaction at issue in this Complaint was no different.

30.     QYK claimed it was only capable of contributing a few million dollars towards this opportunity and did not have sufficient capital to finance production of the entire NYC H+H contract, so it needed access to substantial amounts of capital. QYK and Tammabattula again turned to Lilogy.

31.     However, in order for Lilogy to agree to finance and supply the tests, Lilogy needed to have security that once it laid out millions of dollars in deposits to the manufacturers, inspections, freight, and insurance, the contract was going to be fulfilled and Lilogy was going to be repaid. Thus, prior to winning the bid, Lilogy requested, and Tammabattula agreed during multiple conference calls between August 15 and August 19, that if QYK won the bid, Tammabattula would cause QYK to assign the contract to Lilogy. That would give Lilogy control over the performance of the contract, satisfying the first concern, and ensure Lilogy would be repaid.

32.     On August 19, 2022 Lilogy delivered samples of both Celltrion and Genabio Kits to the NYC H+H procurement offices in New York City on behalf of QYK.

33.     Meanwhile, on August 17, 2022, a previously-unknown company, Barupon LLC submitted its bid.

34.     As part of its submission, Barupon represented the following:

Barupon, LLC is a health care manufacturer and service oriented company established in April 2014. Barupon is a General Services Administration (GSA) contract holder, along with contracts with AZDHS, State of Missouri, City of Philadelphia, Kaiser Permanente, Valley Children's Hospital, LAUSD, SDUSD,

Tarrant county, Department of Energy and multiple corporate customers to provide them covid test kits as needed basis

35.    However, these representations were not true. Barupon was first registered as an LLC with the California Secretary of State on July 25, 2022. Therefore, Barupon had not been offering Covid testing products and services since June 2020 and had no reputation as a "significant provider" of these products.

36.    Lilogy had never heard of Barupon LLC until late on August 19, 2022, when Tammabattula and Rupa Tammabattula informed Lilogy via text message of their bid submission through that entity. Moments after Tammabattula revealed Barupon's existence he stated that if awarded he intended to run the NYC H+H deal through Barupon, and that Lilogy would perform the same role, Barupon would assign the contract to Lilogy and Lilogy would receive the same profit as if the deal had been run through QYK. Tammabattula specifically stated via text message that NYC H+H would issue all documents including the purchase order, letter of intent, and contract to "Brookline LLC c/o Barupon LLC". Tammabattula also represented that NYC H+H would set up Brookline LLC and its bank account payment instructions as the payee in the NYC H+H system for the entirety of the contract, satisfying Lilogy's need for security.

37.    Lilogy came to learn that Barupon is owned by Tammabattula and Rupa Tammabattula, and Rupa Tammabattula is the Founder and CEO of Barupon and Balaji Tammabattula is the Chief Financial Officer and/or Chief Operating Officer.

38.    Despite the absence of any history transacting business, on August 22, 2022, NYC H+H formally announced that Barupon was the winning bidder.

39.    The same day, NYC H+H sent a letter to "Barupon, LLC Attn: Rupa Tammabattula" noting that while the parties had not yet entered into a contract, Barupon was directed to commence performance under the contemplated agreement.

40.     Also on August 22, 2022, Tammabattula advised Lilogy that he was no longer able to contribute any capital to the opportunity. Tammabattula also informed Lilogy that Celltrion was no longer an acceptable test for the contract leaving only Genabio to produce the full 27,725,000 tests.

41.     Because Defendants submitted the bid through Barupon without notice, and contrary to the parties' discussions to this point, Lilogy insisted Barupon execute an Exclusivity Agreement. Thus, on August 22, 2022,[3] Barupon entered into the Exclusivity Agreement with Lilogy attached as **Exhibit D**. ¶

42.     The exclusivity provision provides, in full:

> 1. Exclusivity. Except as otherwise provided herein, **Grantor[4] shall not, and shall cause each of its Representatives** (as defined below) **and Affiliates** (as defined below) **not to, enter into any agreement, contract, understanding, letter of intent, memorandum of understanding, or other arrangement, with any third party for the manufacture and supply of any COVID-19 testing products other than with and through Grantee in accordance with the terms and conditions set forth herein** (a "**Proposed Transaction**"); *provided, however*, that any COVID-19 testing products or SKUs set forth on **Exhibit A** shall be exempt from this Agreement. The Parties may agree to update and supplement Exhibit A from time to time after the date hereof pursuant to a writing signed by the Parties.

Ex. D at ¶ 1 (initial emphasis supplied).

43.     The Exclusivity Agreement also provided Lilogy with a right of first refusal on any "Proposed Transactions" for PPE products on the terms set forth below:

> 2. Right of First Refusal. **In the event that Grantor proposes to engage in any Proposed Transaction, Grantor grants to Grantee a first right of refusal to provide to Grantor any and all COVID-19 testing products, supplies, and services**. If Grantee shall quote pricing for any such products, supplies, or services above the then-current pricing being paid Grantor, Grantor will provide a pricing list and afford Grantee an opportunity to match or beat the last known paid price

---

[3] The Exclusivity Agreement was dated March 7, 2022 (the same date as the Exclusivity Agreement executed between QYK and Lilogy) but was executed on August 22, 2022.

[4] Barupon was defined as the Grantor and Lilogy as the Grantee.

for such test or supplies by Grantor. **In the event that Grantee is unable to match or beat the last known paid price for such test or supplies by Grantor or is unable to supply in the required time period, Grantee may source such test, supplies, or services from such other supplier so long as the price actually paid matches the last known paid price quoted to Grantee, in which case Grantor shall also pay to Grantee a "lost profits" fee equal to 15% of the price paid for such test, supplies, or services.**

*Id.* at ¶ 2 (emphasis supplied).

44.     Thus, pursuant to the Exclusivity Agreement, Barupon agreed not to enter into any agreement, contract, understanding, letter of intent, memorandum of understanding, or other arrangement, with any third party for the manufacture and supply of any Covid-19 testing products other than with and through Lilogy in accordance with the terms and conditions set forth in the Exclusivity Agreement.

45.     Between submitting and winning the bid, Tammabattula continued to represent that he would cause his company to assign the contract to Lilogy, consistent with his prior statements.

46.     However, the contract with NYC H+H provided that the contract could not be assigned without NYC H+H's prior written consent, which NYC H+H advised it was withholding on August 23, 2022.

47.     Tammabattula advised Lilogy on August 23, that NYC H+H was withholding its consent. As an alternative solution, Tammabattula stated he would sell Barupon to Lilogy, which would give Lilogy the control over the contract necessary to fulfill it. Lilogy agreed with this proposal and Barupon provided various documents including its IRS EIN establishment document, Articles of Organization, and Operating Agreement. Lilogy agreed and then began to draft the transactional documents to effectuate the sale.

48.     Lilogy then prepared two separate documents, both titled "Joint Written Consent of the Manager and Member of Barupon LLC," and both of which were dated August 24, 2022. One

document was drafted pursuant to the Minnesota Revised Uniform Limited Liability Company Act and identified Balaji Tammabattula as the sole manager and sole member of Barupon. The other document was drafted pursuant to the California Revised Uniform Limited Liability Company Act and identified Rupa Tammabattula as the sole manager and sole member of Barupon. Each of these documents was executed by the respective Defendant identified therein. Both documents provided, *inter alia*, that Barupon appointed Lilogy's CEO as Vice President and Secretary and granted him authorization to act on behalf of Barupon.

49.     Lilogy then immediately retained and mobilized a third-party inspection team and a Lilogy consultant on the ground in Shanghai, China to conduct inspections of the Kits Genabio was manufacturing for Lilogy to be used for the NYC H+H contract.  Lilogy sent videos, pictures, and reports to Tammabattula and NYC H+H providing the evidence Barupon needed to keep NYC H+H comfortable with its ability to perform as it had committed.

50.     On August 25, 2022, Lilogy's CEO executed the contract with NYC H+H on behalf of Barupon. Based upon information and belief, NYC H+H countersigned the contract. However, Lilogy was never provided with a fully-executed version of the contract.

51.     Also, on August 25, 2022, the CEO and Regional Sales Manager of Genabio visited the Lilogy offices in person to solidify the production, shipping, and payment schedules for the entirety of the NYC H+H contract and further detail the terms of the contract between parties. Due to the diligent work between Lilogy and Genabio up to this point, both parties were confident the required Kits could be delivered by October 1, 2022.

52.     On August 26, 2022, NYC H+H transmitted a purchase order to "Rupa Tammabattula d/b/a Barupon LLC" for the entire amount of the 27,725,000 Kits.

53.     By this time, the Defendants had realized that Barupon's relationship with Genabio, which Lilogy facilitated, was potentially a very lucrative relationship. The NYC H+H contract would generate millions of dollars for Barupon, and if the Defendants did not have to share any of the profit with Lilogy they would be able to reap even larger benefits from the relationship.

54.     The Defendants then wrongfully determined that they were not going to honor their agreements with Lilogy and simply cut Lilogy out of the deal.

55.     Thus, having now employed Lilogy's CEO to sign the contract with NYC H+H in his capacity as Vice President and Secretary of Barupon, the Defendants then began to drag their feet executing the transactional documents for the sale of Barupon to Lilogy.

56.     Defendants also surreptitiously contacted Genabio directly and began attempting to wrest away the 27,725,000 Kits Lilogy had secured for NYC H+H.

57.     On August 28, 2022, Lilogy had a call with the CEO of Genabio. During that call, Genabio's CEO stated that he had been contacted by Tammabattula who told him that Barupon, not Lilogy, was the contract holder with NYC H+H and that Barupon, not Lilogy, would be purchasing the tests Genabio committed to Lilogy for NYC H+H.

58.     Then, out of the blue, on August 31, 2022, Barupon sent Lilogy an "Exclusive Agreement and Contract Termination Letter" signed by Rupa Tammabattula. In the letter, Barupon terminated the Exclusivity Agreement backdated to August 22, 2022 due to a purported "breach" by Lilogy. Barupon claimed Lilogy had failed to enter into a contract with Genabio, issue purchase orders to Genabio, and transmit any deposits to Genabio. However, as Barupon, Rupa Tammabattula, and Balaji Tammabattula knew, control over the contract was the contingency required in order for Lilogy to pay the deposit to Genabio and secure financing for the initial orders, shipping, and insurance necessary to begin performing. By dragging its feet with respect

to the sale of Barupon, Barupon and the Tammabattulas knowingly made it impossible for Lilogy to have the requisite security to begin laying out millions of dollars to purchase the Kits.

59.    The Termination Letter was a pretext to provide cover with respect to the Defendants' unlawful circumvention of Lilogy. However, despite Barupon's cancellation of the Exclusivity Agreement, by its terms it applies for 24 months after execution.

60.    These developments from August 28 through August 31 caused Lilogy great concern, and Lilogy insisted on having a conference call with Tammabattula to discuss the status of the deal. That call occurred on the evening of August 31, 2022. During the call, Tammabattula stated that he had secured financing and also found a portion of the Kits on his own and no longer needed Lilogy to supply the full quantity. Tammabattula also stated that because he had secured both the Kits and financing on his own, he no longer wanted to sell Barupon to Lilogy. Lilogy reminded Tammabattula of Barupon's obligations under the Exclusivity Agreement and specifically asked if Tammabattula was purchasing the Kits from Genabio. Tammabattula lied and stated that he was sourcing the Kits from a manufacturer other than Genabio. Tammabattula was non-committal on how many Kits he had secured and left the door open for Lilogy to possibly sell a smaller number of Genabio Kits to Barupon.

61.    However, Tammabattula continued to string Lilogy along with a series of false statements intended to buy Lilogy's cooperation until Tammabattula could secure Genabio's stock directly. Tammabattula was careful not to completely alienate Lilogy so that if he was unable to secure all of the Kits needed to fulfill the NYC H+H contract, Lilogy could serve as a backstop.

62.    For example, on September 1, 2022, Tammabattula said to Lilogy during a telephone call that his last minute re-trading of the deal was not premeditated and was not caused

by "money or greed." Tammabattula also stated words to the effect of: "My intention is to get Lilogy whatever it was supposed to make. Otherwise I would feel bad about it forever."

63.     These representations were untrue, for Tammabattula and his wife Rupa Tammabattula, individually and through QYK and Barupon, deprived Lilogy of the opportunity to earn any money on this significant transaction.

64.     Furthermore, on September 1, 2022 Lilogy had a call with the CEO of Genabio who stated that Tammabattula informed him Barupon was not working with nor buying tests through Lilogy, and that Barupon would be purchasing the tests directly from Genabio for NYC H+H.  Genabio's CEO stated that the production originally designated for Lilogy was being reallocated to Barupon.

65.     Upon information and belief, Barupon fulfilled the entire order of 27,725,000 Kits by the deadline of October 1, 2022 with Genabio Kits.

66.     Barupon's performance of the NYC H+H contract would have been impossible but for Lilogy's performance of its obligations as set forth in the parties' agreements and in reliance upon Tammabattula's representations. Lilogy secured production of all of the test kits, identified and delineated the shipping routes, and otherwise ensured the kits would be delivered to complete the NYC H+H contract in full.

67.     All conditions precedent have been met, are waived or excused, or would be futile.

68.     Plaintiff has been forced to hire the undersigned law firm and is obligated to pay said law firm its reasonable attorneys' fees.

<u>**Count I: Fraudulent Misrepresentation**</u>
<u>**(Against Balaji Tammabattula)**</u>

69.     Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

70.     In order to induce Lilogy to agree to supply the Kits for the NYC H+H contract, Tammabattula fraudulently misrepresented the following material facts to Lilogy, including, but not limited to, the following:

a.  On August 15th, 2022, Tammabattula stated over the telephone that if QYK won the bid, it would rely upon Lilogy to supply the Kits through Lilogy's manufacturers, Genabio and Celltrion;

b.  During that call, Tammabattula further stated that Lilogy would secure the production, organize the shipping, and build out all the other components of an international supply chain necessary to supply the test Kits and for such efforts receive its portion of the profits from QYK and Tammabattula;

c.  Prior to the submission of the bid, Tammabattula stated over the phone that if QYK won the bid, he would assign the contract to Lilogy;

d.  On August 19, 2022, Mr. Tammabattula stated via text message that NYC H+H would issue all documents including the purchase order, letter of intent, and contract to "Brookline LLC c/o Barupon LLC". Tammabattula also represented that NYC H+H would set up Brookline LLC and its bank account payment instructions as the payee in the NYC H+H system for the entirety of the contract, satisfying Lilogy's need for security;

e.  During a phone call on August 19, 2022, Tammabattula stated that he intended to run the NYC H+H deal through Barupon, but that Lilogy would perform the same role, Barupon would assign the contract to Lilogy and Lilogy would receive the same profit as if the deal had been run through QYK;

f.  On August 23, 2022, when Tammabattula learned NYC H+H would not provide its written consent to assign the contract to Lilogy, Tammabattula stated that he would sell Barupon to Lilogy, which would give Lilogy the control over the contract necessary to fulfill it;

g.  During a call on August 31, 2022, Tammabattula stated that he had secured financing and also found a portion of the Kits on his own and no longer needed Lilogy to supply the full quantity. Tammabattula also stated that because he had secured both the Kits and financing on his own, he no longer wanted to sell Barupon to Lilogy. Lilogy reminded Tammabattula of Barupon's obligations under the Exclusivity Agreement and specifically asked if Tammabattula was purchasing the Kits from Genabio. Tammabattula lied and stated that he was sourcing the Kits from a manufacturer other than Genabio. Tammabattula was non-committal on how many Kits he had secured and left the door open for Lilogy to possibly sell a smaller number of Genabio Kits to Barupon;

h.  Tammabattula continued to string Lilogy along with a series of false statements intended to buy Lilogy's cooperation until Tammabattula could secure Genabio's stock directly. Tammabattula was careful not to completely alienate Lilogy so that if he was unable to secure all of the Kits needed to fulfill the NYC H+H contract, Lilogy could serve as a backstop. For example, on September 1, 2022, Tammabattula said to Lilogy during a telephone call that his last minute re-trading of the deal was not premeditated and was not caused by "money or greed." Tammabattula also stated words to the effect of: "My intention is to get Lilogy

whatever it was supposed to make. Otherwise I would feel bad about it forever[,]"
and;

    i.    Other misrepresentations to be uncovered during discovery.

71.    Tammabattula knew these representations were false when he made them, for he never intended to allow Lilogy to supply the Kits, never intended to assign the NYC H+H contract to Lilogy, never intended to sell Barupon to Lilogy, intended to hide the fact he wrongfully circumvented Lilogy by purchasing the Kits directly from Genabio, and wanted to ensure Lilogy never made any money on the NYC H+H transaction but only wanted Lilogy to secure the Kits and organize the logistics.

72.    Tammabattula made these statements, knowing they were false, with the intent to induce Lilogy to secure the necessary 27,725,000 Kits, set up the shipping and supply chain and thereby generate revenue for Barupon.

73.    Lilogy reasonably relied on Tammabattula's fraudulent misrepresentations.

74.    As a direct and proximate result of Tammabattula's fraudulent statements, Plaintiff has been damaged in an amount in excess of this Court's jurisdictional minimum.

WHEREFORE, by reason of the above and foregoing, the Plaintiff requests that this Court enter Judgment in its favor, award the Plaintiff compensable damages, prejudgment interest, and award Plaintiff all other relief deemed justified and proper.

### Count II: Negligent Misrepresentation
### (Against Balaji Tammabattula)

75.    Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

76.    Tammabattula had a duty to provide Lilogy the correct information based upon his special relationship with Lilogy. Specifically, Tammabattula's representations that he would cause

Barupon to assign the NYC H+H contract to Lilogy, cause Barupon to be sold to Lilogy, share profits with Lilogy, and his act to appoint Lilogy's CEO as Vice President and Secretary of Barupon, constituted a special relationship.

77.     In order to induce Lilogy to agree to supply the Kits for the NYC H+H contract, Tammabattula negligently misrepresented the following material facts to Lilogy that he may have believed to be true but were in fact false:

    a.  On August 15th, 2022, Tammabattula stated over the telephone that if QYK won the bid, it would rely upon Lilogy to supply the Kits through Lilogy's manufacturers, Genabio and Celltrion;

    b.  During that call, Tammabattula further stated that Lilogy would secure the production, organize the shipping, and build out all the other components of an international supply chain necessary to supply the test Kits and for such efforts receive its portion of the profits from QYK and Tammabattula;

    c.  Prior to the submission of the bid, Tammabattula stated over the phone that if QYK won the bid, he would assign the contract to Lilogy;

    d.  On August 19, 2022, Mr. Tammabattula stated via text message that NYC H+H would issue all documents including the purchase order, letter of intent, and contract to "Brookline LLC c/o Barupon LLC". Tammabattula also represented that NYC H+H would set up Brookline LLC and its bank account payment instructions as the payee in the NYC H+H system for the entirety of the contract, satisfying Lilogy's need for security;

    e.  During a phone call on August 19, 2022, Tammabattula stated that he intended to run the NYC H+H deal through Barupon, but that Lilogy would perform the same

role, Barupon would assign the contract to Lilogy and Lilogy would receive the same profit as if the deal had been run through QYK;

f.  On August 23, 2022, when Tammabattula learned NYC H+H would not provide its written consent to assign the contract to Lilogy, Tammabattula stated that he would sell Barupon to Lilogy, which would give Lilogy the control over the contract necessary to fulfill it;

g.  During a call on August 31, 2022, Tammabattula stated that he had secured financing and also found a portion of the Kits on his own and no longer needed Lilogy to supply the full quantity. Tammabattula also stated that because he had secured both the Kits and financing on his own, he no longer wanted to sell Barupon to Lilogy. Lilogy reminded Tammabattula of Barupon's obligations under the Exclusivity Agreement and specifically asked if Tammabattula was purchasing the Kits from Genabio. Tammabattula lied and stated that he was sourcing the Kits from a manufacturer other than Genabio. Tammabattula was non-committal on how many Kits he had secured and left the door open for Lilogy to possibly sell a smaller number of Genabio Kits to Barupon;

h.  Tammabattula continued to string Lilogy along with a series of false statements intended to buy Lilogy's cooperation until Tammabattula could secure Genabio's stock directly. Tammabattula was careful not to completely alienate Lilogy so that if he was unable to secure all of the Kits needed to fulfill the NYC H+H contract, Lilogy could serve as a backstop. For example, on September 1, 2022, Tammabattula said to Lilogy during a telephone call that his last minute re-trading of the deal was not premeditated and was not caused by "money or greed."

Tammabattula also stated words to the effect of: "My intention is to get Lilogy whatever it was supposed to make. Otherwise I would feel bad about it forever[,]" and;

     i.    Other representations to be uncovered during discovery.

78.    Tammabattula should have known his representations were false because he should have known he was unwilling to share any monies or profits whatsoever with Lilogy on the NYC H+H transaction due to the sheer scale of the profits available.

79.    Tammabattula knew the information he was negligently supplying was desired by Lilogy for a serious purpose; namely, securing 27,725,000 Kits for the NYC H+H contract, which required obtaining financing, shipping, and insurance to ensure same were delivered.

80.    Lilogy intended to rely and act upon these negligent misrepresentations.

81.    Lilogy reasonably relied upon these misrepresentations to its detriment.

82.    As a direct and proximate result of Tammabattula's negligent statements, Plaintiff has been damaged in an amount in excess of this Court's jurisdictional minimum.

WHEREFORE, by reason of the above and foregoing, the Plaintiff requests that this Court enter Judgment in its favor, award the Plaintiff compensable damages, prejudgment interest, and award Plaintiff all other relief deemed justified and proper.

### Count III: Civil Conspiracy to Commit Fraud
### (Against Rupa Tammabattula)

83.    Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

84.    Rupa Tammabattula reached an agreement with her husband, Balaji Tammabattula, to fraudulently induce Lilogy to secure the 27,725,000 Kits and create the supply chain to transport same so their company, Barupon, could win and then perform the NYC H+H contract.

85.     Rupa Tammabattula took specific acts in furtherance of this common objective with her husband, including, but not limited to, the following:

     a.   Agreed to hold herself out as the Founder and CEO of Barupon;

     b.   Communicating directly with the NYC H+H regarding the bid;

     c.   Executing the Joint Written Consent of the Manager and Member of Barupon LLC dated August 24, 2022 that identified Rupa Tammabattula as the sole manager and sole member of Barupon, and by which Barupon appointed Lilogy's CEO Vice President and Secretary and granted him authorization to act on behalf of Barupon;

     d.   Signing the Exclusive Agreement and Contract Termination Letter dated August 30, 2022, and;

     e.   Other specific acts to be uncovered during discovery.

86.     Rupa Tammabattula had knowledge of the fraud because she was the Founder and CEO of Barupon, her husband was actively perpetuating the fraud, and she personally executed the Joint Written Consent of the Manager and Member of Barupon LLC and Exclusive Agreement and Contract Termination Letter.

87.     As a direct and proximate result of Tammabattula's conspiracy to commit fraud, Plaintiff has been damaged in an amount in excess of this Court's jurisdictional minimum.

WHEREFORE, by reason of the above and foregoing, the Plaintiff requests that this Court enter Judgment in its favor, award the Plaintiff compensable damages, prejudgment interest, and award Plaintiff all other relief deemed justified and proper

### Count IV: Breach of Contract
### (Exclusivity Agreement: QYK Brands LLC)

88.     Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

89.     On March 7, 2022, Lilogy and QYK entered into the Exclusivity Agreement attached as Exhibit A.

90.     The exclusivity provision provides, in full:

1. Exclusivity. Except as otherwise provided herein, **Grantor[5] shall not, and shall cause each of its Representatives** (as defined below) **and Affiliates** (as defined below) **not to, enter into any agreement, contract, understanding, letter of intent, memorandum of understanding, or other arrangement, with any third party for the manufacture and supply of any COVID-19 testing products other than with and through Grantee in accordance with the terms and conditions set forth herein** (a "**Proposed Transaction**"); *provided, however*, that any COVID-19 testing products or SKUs set forth on **Exhibit A** shall be exempt from this Agreement. The Parties may agree to update and supplement Exhibit A from time to time after the date hereof pursuant to a writing signed by the Parties.

Ex. A at ¶ 1 (initial emphasis supplied).

91.     The Exclusivity Agreement also provided Lilogy with a right of first refusal on the terms set forth below:

2. Right of First Refusal. **In the event that Grantor proposes to engage in any Proposed Transaction, Grantor grants to Grantee a first right of refusal to provide to Grantor any and all COVID-19 testing products, supplies, and services**. If Grantee shall quote pricing for any such products, supplies, or services above the then-current pricing being paid Grantor, Grantor will provide a pricing list and afford Grantee an opportunity to match or beat the last known paid price for such test or supplies by Grantor. **In the event that Grantee is unable to match or beat the last known paid price for such test or supplies by Grantor or is unable to supply in the required time period, Grantee may source such test, supplies, or services from such other supplier so long as the price actually paid matches the last known paid price quoted to Grantee, in which case Grantor shall also pay to Grantee a "lost profits" fee equal to 15% of the price paid for such test, supplies, or services.**

*Id.* at ¶ 2 (emphasis supplied).

---

[5] QYK was defined as the Grantor and Lilogy as the Grantee.

92.     The Exclusivity Agreement prescribes an initial term of twenty-four months with automatic one-year renewals and may be terminated with written notice not less than 60 days prior to the expiration of the term.

93.     Lilogy performed under the Exclusivity Agreement by identifying a manufacturer, Genabio, who could deliver the quantity of tests needed by October 1, 2022 at an acceptable price.

94.     QYK breached the Exclusivity Agreement by:

a.    Permitting its Representatives and Affiliates (Barupon, Balaji Tammabattula, and Rupa Tammabattula) to enter into a contract with Genabio for the manufacture and supply of the 27,725,000 Kits to the exclusion of Lilogy, thereby using Barupon to evade QYK's obligations under the Exclusivity Agreement;

b.    Failing to honor the right of first refusal in the Exclusivity Agreement, and;

c.    Failing to engage in all discussions and negotiations in good faith and use its reasonable best efforts to consummate the NYC H+H transaction in conformity with the terms and conditions of the Exclusivity Agreement.

95.     As a direct and proximate result of QYK'S breach of contract, Plaintiff has been damaged in an amount in excess of this Court's jurisdictional minimum.

WHEREFORE, by reason of the above and foregoing, the Plaintiff requests that this Court enter Judgment in its favor, award the Plaintiff compensable damages, prejudgment interest, and award Plaintiff all other relief deemed justified and proper.

### Count V: Breach of Contract
### (Mutual Non-Disclosure and Non-Circumvent Agreement – QYK Brands LLC)

96.     Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

97.     On May 11, 2022, Lilogy and QYK entered into a Mutual Non-Disclosure and Non-Circumvent Agreement ("MNDA"). The MNDA required the parties to keep information confidential.

98.     The non-circumvention provided, in full:

**9. NON-CIRCUMVENTION**

a. **During the Term of this Agreement** as set forth in Section 6, above, **the Parties hereby acknowledge that information furnished by either of the Parties to the other Party concerning any prospective transaction** for the manufacture, procurement, sourcing, supply and distribution of hand sanitizer, protective gloves, face masks, isolation gowns, and other janitorial, medical, and personal protection equipment products, and other products **and including leads, opportunities, situations, corporations, partnerships, and/or persons conducive to any prospective buyer, seller, manufacturer, supplier, distributor, vendor, partner, investor or borrower, are the personal property of the introducing Party, and therefore, hereby irrevocably agree not to, and to cause each of their members, shareholders, officers, directors, employees, consultants, contractors, agents, representatives, affiliates, or not to, circumvent, avoid, bypass, or obviate (collectively "Circumvent") the introducing Party, directly or indirectly**. For the avoidance of doubt, any breach of this Section 9, or breach of a Recipient's obligation to maintain the confidentiality of a Disclosing Party's Confidential and Proprietary Information that results in any third party engaging in a transaction that would otherwise be prohibited by the first party of this Section 9(a) if engaged in by Recipient shall be deemed to be a breach of Recipients obligation not to Circumvent pursuant to this Section 9(a). Either Party will immediately inform the other Party regarding any agreement, arrangement, meeting, contact, undertaking, act or intent, including transactions and situations involving investors and/or prospective clients, customers, re-sellers, manufacturers, or distributors of hand sanitizer, protective gloves, face masks, isolation gowns, and other janitorial, medical, and personal protection equipment products, other personal protection equipment products, or other products in subsequent transactions, or occurring after the termination of this agreement, by which a commission, fee, profit, income, royalty, back-in, reversionary interest, or other benefit could result or accrue to the introducing party concerning such prospective clients, customers, re-sellers, manufacturers, or distributors, including leads, opportunities, situations, corporations, partnerships, and/or persons. **In the event of circumvention, either directly or indirectly, the introducing Party shall be entitled to all sums, fees, or other value it would have realized if not for the circumvention, as well as any other remedies available to such introducing Party at law or equity. In connection with any action by either Party to enforce it rights under this agreement,** or in collection actions arising therefrom, **then either Party shall be entitled to recover its reasonable outside attorneys' fees**

**and costs from the breaching Party, including fees and costs incurred for mediation, arbitration and/or all judicial actions and appeals**

Ex. B at ¶ 9 (emphasis supplied).

99.    The MNDA has a 5-year term and has never been terminated.

100.    Lilogy performed under the MNDA by maintaining QYK's "Confidential and Proprietary Information" confidential and by not circumventing QYK.

101.    QYK breached the MNDA by permitting its owners, Balaji Tammabattula and Rupa Tammabattula, to circumvent Lilogy through Barupon as more specifically alleged herein.

102.    As a direct and proximate result of QYK'S breach of contract, Plaintiff has been damaged in an amount in excess of this Court's jurisdictional minimum.

WHEREFORE, by reason of the above and foregoing, the Plaintiff requests that this Court enter Judgment in its favor, award the Plaintiff compensable damages, prejudgment interest, and award Plaintiff all other relief deemed justified and proper.

<u>**Count VI: Breach of Contract**</u>
<u>**(Exclusivity Agreement: Barupon LLC)**</u>

103.    Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

104.    On August 22, 2022, Lilogy and Barupon entered into the Exclusivity Agreement attached as Exhibit D.

105.    The exclusivity provision provides, in full:

1. Exclusivity. Except as otherwise provided herein, **Grantor[6] shall not, and shall cause each of its Representatives** (as defined below) **and Affiliates** (as defined below) **not to, enter into any agreement, contract, understanding, letter of intent, memorandum of understanding, or other arrangement, with any third party for the manufacture and supply of any COVID-19 testing products other than with and through Grantee in accordance with the terms and conditions**

---

[6] QYK was defined as the Grantor and Lilogy as the Grantee.

set forth herein (a "**Proposed Transaction**"); *provided, however*, that any COVID-19 testing products or SKUs set forth on **Exhibit A** shall be exempt from this Agreement. The Parties may agree to update and supplement Exhibit A from time to time after the date hereof pursuant to a writing signed by the Parties.

Ex. A at ¶ 1 (initial emphasis supplied).

106.    The Exclusivity Agreement also provided Lilogy with a right of first refusal on the

terms set forth below:

2. Right of First Refusal. **In the event that Grantor proposes to engage in any Proposed Transaction, Grantor grants to Grantee a first right of refusal to provide to Grantor any and all COVID-19 testing products, supplies, and services**. If Grantee shall quote pricing for any such products, supplies, or services above the then-current pricing being paid Grantor, Grantor will provide a pricing list and afford Grantee an opportunity to match or beat the last known paid price for such test or supplies by Grantor. **In the event that Grantee is unable to match or beat the last known paid price for such test or supplies by Grantor or is unable to supply in the required time period, Grantee may source such test, supplies, or services from such other supplier so long as the price actually paid matches the last known paid price quoted to Grantee, in which case Grantor shall also pay to Grantee a "lost profits" fee equal to 15% of the price paid for such test, supplies, or services.**

*Id.* at ¶ 2 (emphasis supplied).

107.    The Exclusivity Agreement prescribes an initial term of twenty-four months with

automatic one-year renewals and may be terminated with written notice not less than 60 days prior

to the expiration of the term.

108.    Lilogy performed under the Exclusivity Agreement by identifying a manufacturer,

Genabio, who could deliver the quantity of tests needed by October 1, 2022 at an acceptable price.

109.    Barupon breached the Exclusivity Agreement by:

a.   Not permitting Lilogy to supply the Kits for the NYC H+H contract;

b.   Permitting its Representatives and Affiliates (Barupon, Balaji Tammabattula, and

Rupa Tammabattula) to enter into a contract with Genabio for the manufacture and

supply of the 27,725,000 Kits to the exclusion of Lilogy, thereby failing to honor

the exclusivity provision of the contract;

c.   Failing to honor the right of first refusal in the Exclusivity Agreement, and;

d.   Failing to engage in all discussions and negotiations in good faith and use its

reasonable best efforts to consummate the NYC H+H transaction in conformity

with the terms and conditions of the Exclusivity Agreement

110.   As a direct and proximate result of Barupon's breach of contract, Plaintiff has been

damaged in an amount in excess of this Court's jurisdictional minimum.

WHEREFORE, by reason of the above and foregoing, the Plaintiff requests that this Court

enter Judgment in its favor, award the Plaintiff compensable damages, prejudgment interest, and

award Plaintiff all other relief deemed justified and proper.

### Count VII: Promissory Estoppel
### (Against Balaji Tammabattula)

111.   Plaintiff re-alleges and incorporates by reference the allegations contained in

Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

112.   In August 2022, Tammabattula made a number of clear and unambiguous promises

to Lilogy for the purpose of inducing Lilogy to secure the 27,725,000 Kits for the NYC H+H

contract, including, but not limited to, the following:

a.   On August 15th, 2022, Tammabattula stated over the telephone that if QYK won

the bid, it would rely upon Lilogy to supply the Kits through Lilogy's

manufacturers, Genabio and Celltrion;

b.   During that call, Tammabattula further stated that Lilogy would secure the

production, organize the shipping, and build out all the other components of an

international supply chain necessary to supply the test Kits and for such efforts receive its portion of the profits from QYK and Tammabattula;

c. Prior to the submission of the bid, Tammabattula stated over the phone that if QYK won the bid, he would assign the contract to Lilogy;

d. On August 19, 2022, Mr. Tammabattula stated via text message that NYC H+H would issue all documents including the purchase order, letter of intent, and contract to "Brookline LLC c/o Barupon LLC". Tammabattula also represented that NYC H+H would set up Brookline LLC and its bank account payment instructions as the payee in the NYC H+H system for the entirety of the contract, satisfying Lilogy's need for security;

e. During a phone call on August 19, 2022, Tammabattula stated that he intended to run the NYC H+H deal through Barupon, but that Lilogy would perform the same role, Barupon would assign the contract to Lilogy and Lilogy would receive the same profit as if the deal had been run through QYK;

f. On August 23, 2022, when Tammabattula learned NYC H+H would not provide its written consent to assign the contract to Lilogy, Tammabattula stated that he would sell Barupon to Lilogy, which would give Lilogy the control over the contract necessary to fulfill it;

g. During a call on August 31, 2022, Tammabattula stated that he had secured financing and also found a portion of the Kits on his own and no longer needed Lilogy to supply the full quantity. Tammabattula also stated that because he had secured both the Kits and financing on his own, he no longer wanted to sell Barupon to Lilogy. Lilogy reminded Tammabattula of Barupon's obligations under the

Exclusivity Agreement and specifically asked if Tammabattula was purchasing the Kits from Genabio. Tammabattula lied and stated that he was sourcing the Kits from a manufacturer other than Genabio. Tammabattula was non-committal on how many Kits he had secured and left the door open for Lilogy to possibly sell a smaller number of Genabio Kits to Barupon;

h.  Tammabattula continued to string Lilogy along with a series of false statements intended to buy Lilogy's cooperation until Tammabattula could secure Genabio's stock directly. Tammabattula was careful not to completely alienate Lilogy so that if he was unable to secure all of the Kits needed to fulfill the NYC H+H contract, Lilogy could serve as a backstop. For example, on September 1, 2022, Tammabattula said to Lilogy during a telephone call that his last minute re-trading of the deal was not premeditated and was not caused by "money or greed." Tammabattula also stated words to the effect of: "My intention is to get Lilogy whatever it was supposed to make. Otherwise I would feel bad about it forever[,]" and;

i.  Other representations to be uncovered during discovery.

113.  It was reasonable and foreseeable for Lilogy to rely upon Tammabattula' promises, particularly in light of the fact that Tammabattula caused Barupon to make Lilogy's CEO the Vice President and Secretary of Barupon on August 24, 2022.

114.  Lilogy relied upon these promises to its detriment.

115.  As a direct and proximate result of Tammabattula's change in position, Plaintiff has been damaged in an amount in excess of this Court's jurisdictional minimum.

WHEREFORE, by reason of the above and foregoing, the Plaintiff requests that this Court enter Judgment in its favor, award the Plaintiff compensable damages, prejudgment interest, and award Plaintiff all other relief deemed justified and proper.

### Count VIII: Unjust Enrichment
### (Against Barupon LLC)

116.    Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

117.    Balaji Tammabattula, in his individual capacity and as the sole manager and sole member of Barupon, made the promises alleged above that Barupon would rely upon Lilogy to supply the Kits, assign the NYC H+H contract to Lilogy, that Barupon would be sold to Lilogy, had not circumvented Lilogy by purchasing the Kits directly from Genabio, and wanted to ensure Lilogy never made any money on the NYC H+H transaction, in order to obtain the benefit of Lilogy securing the 27,725,000 Kits and creating the supply chain to deliver same.

118.    As the sole manager and sole member of Barupon, Tammabattula's statements bound Barupon. Thus, Barupon made a series of implied promises to Lilogy that it would supply the Kits, that the NYC H+H contract would be assigned to Lilogy, that Barupon would be sold to Lilogy, and that Lilogy would make money on the NYC H+H transaction.

119.    There was a confidential relationship between Lilogy and Barupon because Barupon had an obligation to ensure that Lilogy received what Tammabattula promised.

120.    In reliance on Barupon's promises, Lilogy secured the 27,725,000 Kits and created the supply chain to deliver same.

121.    By virtue of Lilogy's efforts to secure the 27,725,000 Kits and create the supply chain to deliver same, Lilogy had a right to share in the profits from the NYC H+H transaction.

122.     As detailed more fully above, Barupon wrongfully deprived Lilogy of its profits from the NYC H+H transaction and has been unjustly enriched as a result.

123.     Lilogy therefore conferred a benefit on Barupon in the form of Lilogy's profits that were wrongfully not distributed to it, which Barupon had knowledge of.

124.     It is against equity and good conscience to permit Barupon to retain Lilogy's profits from the NYC H+H transaction.

125.     The Court should therefore impose a constructive trust over Barupon's funds that represents Lilogy's share of the profits Barupon earned on the NYC H+H transaction.

126.     These funds are specific and identifiable as the same should be accounted for in Barupon's books and records.

WHEREFORE, by reason of the above and foregoing, the Plaintiff requests that this Court enter Judgment in its favor, award the Plaintiff compensable damages, prejudgment interest, impose a constructive trust over Barupon's funds which represent Lilogy's share of the profits Barupon earned on the NYC H+H transaction, and award Plaintiff all other relief deemed justified and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demands a trial by jury on all issues so triable as a matter of right.

Dated: February 1, 2023

Respectfully submitted,

THE ROTH LAW FIRM, PLLC

By: */s/ Brian Levenson*
Brian Levenson, Esq.
brian@rrothlaw.com

Richard Roth, Esq.
rich@rrothlaw.com
295 Madison Avenue, Fl. 22
New York, NY 10017
TEL. (212) 542-8882


LETO LAW FIRM

MATTHEW P. LETO
(*pro hac vice* application to be made)
Florida Bar No.: 014504
mleto@letolawfirm.com
CHARLES P. GOURLIS
(*pro hac vice* application to be made)
Florida Bar No.: 85924
cgourlis@letolawfirm.com
201 S. Biscayne Blvd.
Suite 2700
Miami, Florida 33131
TEL. 305-341-3155
FAX. 305-397-1168